**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TOLLIE CARTER,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>MARIA A. PALLANTE,<br>REGISTER OF COPYRIGHTS,<br>ARC/CONRAD MUSIC, LLC,<br>FUJI MUSIC GROUP, INC. and<br>BMG RIGHTS MANAGEMENT (US) LLC,<br>d/b/a/ BMG CHRYSALIS US<br><br>　　　　　　Defendants. | Case No. 16-cv-06786<br><br>Honorable John Z. Lee<br><br>Honorable Mary M. Rowland<br><br><u>Jury Trial Demanded</u> |

<u>**VERIFIED FIRST AMENDED COMPLAINT**</u>

Plaintiff Tollie Carter ("Plaintiff"), by and through his undersigned counsel, hereby brings this Verified First Amended Complaint against Defendants Maria A. Pallante, Register of Copyrights for the U.S. Copyright Office ("Register of Copyrights"), ARC /Conrad Music, LLC, Fuji Music Group, Inc., and BMG Rights Management (US) LLC d/b/a BMG Chrysalis US. In support thereof, Plaintiff states as follows:

<u>**PARTIES**</u>

1.　　Plaintiff is an individual with primary and permanent residence in Chicago, Illinois.

2.　　Register of Copyright Maria A. Pallante is an officer or employee of the United States, and is the necessary defendant to this lawsuit pursuant to 17 U.S.C. §701(e).

3.    ARC/Conrad Music, LLC ("ARC"), which, upon information and belief, was formerly known as "Conrad Music," "Conrad Publishing Company, Inc.," "Arc Music Group," and "Arc Music Corp.," and is presently owned by Fuji Music Group, Inc., is a California limited liability company with its principal place of business at 21241 S. Western Ave., Ste. 200, Torrance, California 90501.

4.    Fuji Music Group, Inc. ("Fuji"), which, upon information and belief, was formerly known as Fuji Entertainment America, Inc., is a California corporation, with its principal place of business at 21241 S. Western Ave., Ste. 200, Torrance, California 90501.

5.    BMG Rights Management (US) LLC is a Delaware corporation ("BMG"), registered to do business in California and New York, with its principal place of business at 1745 Broadway, 19th floor, New York, NY, 10019.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over Register of Copyrights in this action pursuant to the Administrative Procedure Act, 5 U.S.C. §703.

7.    This Court has subject matter jurisdiction over BMG, Fuji, and ARC pursuant to 28 U.S.C. §§1331 and 1338(a) because Plaintiff claims BMG, Fuji, and ARC violated federal copyright law, 17 U.S.C. §§ 101, *et seq*. This Court has supplemental jurisdiction over Plaintiff's related state law claims under 18 U.S.C. § 1367.

8.    This Court has specific personal jurisdiction over BMG, Fuji, and ARC because they have engaged in conduct, giving rise to the claims herein, that satisfies the Illinois long-arm statute (735 ILCS 5/2-209), including the commission of tortious acts within Illinois and the commission of tortious acts outside Illinois knowing and intending that such act would interfere with Illinois interests and cause injury within Illinois.  Based on information and belief, BMG,

Fuji, and ARC have licensed for profit the copyrighted music at issue to Illinois-based and non-Illinois entities and individuals to the injury of Plaintiff, an Illinois resident.

9.     Venue is proper in this Court pursuant to 28 U.S.C. §§1391(b)(2) and 1391(e).

## BACKGROUND

### Renewals Rights & Termination Rights

10.     The 1909 federal copyright statute provided musicians and songwriters with copyright protection for their works for a 28-year term, as well as the power to "renew" that copyright protection for an additional 28-year term.  17 U.S.C. § 24 (1909).

11.     The purpose of this "renewal right" was to provide songwriters the opportunity to recapture ownership of their copyright alienated during its original term or protection in order to obtain a greater economic benefit from its exploitation.  *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 185 (1985).

12.     This renewal right, however, did not vest until the end of the first copyright term. Therefore, even if an author explicitly transferred his or her renewal right during his or her life, if that author died before the end of the first copyright term, such a transfer had no legal consequence and the renewal right instead vested in the author's statutorily-designated heirs according to the Copyright Act.  *See Stewart v. Abend*, 495 U.S. 207, 219-220 (1990).

13.     Effective January 1, 1978, the 1976 Copyright Act ("the Copyright Act") replaced the 1909 federal copyright statute.  For works created (or published) after December 31, 1977, the Copyright Act provides a single protection term (recently amended to "life of the author plus 70 years").  17 U.S.C. § 302(a).  With no more renewal periods, the Copyright Act added "termination rights" to replace the originally-intended function of renewal rights.  Termination rights apply to works created (or published) both before and after December 31, 1977 (and

3

supplement previous renewal rights for the works created or published before December 31, 1977).

14.     Like renewal rights, termination rights provide musicians and songwriters (and their statutorily-designed heirs) with the right to regain ownership of copyrights that they transferred to outside entities, such as record labels and music publishers, at a much later date when they better know the value of the works and are in a better bargaining position to negotiate with publishers and other powerful entities.  17 U.S.C. § 203, 304.  The right trumps state contract law and any "perpetual agreement" or "complete assignment" made thereunder.

15.     To exercise their termination rights, authors or their statutorily-designated heirs must serve a Notice of Termination to the correct party in accordance with the requirements set forth in the Copyright Act and by rules promulgated by the Copyright Office.  They must then file that Notice of Termination with the United States Copyright Office.

**Plaintiff's Rights to the Carter Songs**

16.     Calvin T. Carter ("Mr. Calvin Carter") was a songwriter, record producer, and music publisher of songs from the 1950's through the 1970's.  He wrote or co-wrote several songs and assigned many of these songs to Arc Music Corp. via a written agreement in November of 1965.

17.     Mr. Calvin Carter died in 1986 and, by 1999, Mr. Calvin Carter had no surviving spouses, children, or grandchildren other than Plaintiff—Mr. Calvin Carter's son.

18.     Since 1999, therefore, Plaintiff has been the sole statutorily designated heir to Mr. Calvin Carter's termination rights.  17 U.S.C. § 304(c)(2).

19.     Plaintiff is also the sole heir to Mr. Calvin Carter's estate, including his copyrighted works such as the song "Goodnight Sweetheart Goodnight" (a big hit during the

4

mid-1950's and decades thereafter), as well as publishing rights that Mr. Calvin Carter held in his company Stance Music. See Letter of Administration attached as Exh. 1. Upon Mr. Calvin Carter's death, Plaintiff and his then-living brother (Mr. Calvin Carter's surviving children) were the sole statutorily designated heirs to Mr. Calvin's renewals rights. See 17 U.S.C. § 304(a)(1)(C)(ii).

20.     As heir to Mr. Calvin Carter's termination rights and renewal rights, Plaintiff has exercised his rights to recapture the copyrights to various Carter-written or co-written songs: 3 songs by way of termination in 2010, 36 songs by way of termination in 2012, and 22 songs by virtue of filing renewal copyright registrations from 1986 through 1993.

**Plaintiff's Rights to the Bracken Songs**

21.     Mr. Calvin Carter's sister, Vivian Bracken (Plaintiff's aunt), and her husband, James Bracken (Plaintiff's uncle) founded Vee-Jay Records, a well-known record company in the 1950's through the 1960's, which was the first U.S. company to release works by the Beatles.

22.     James Bracken wrote or co-wrote (and copyrighted) several songs during the 1950's and 1960's; he also owned publishing rights to various songs through his company, Costoma Publishing.

23.     James Bracken died on February 20, 1972, leaving his nephew, Plaintiff, as the administrator of his estate. Vivian Bracken inherited James Bracken's estate, and, when Vivian Bracken died, Plaintiff inherited her estate. Accordingly, Plaintiff now owns copyrights for many musical compositions written by Bracken, as well as publishing rights that Bracken held in his company Costoma Publishing. See Letters of Administration attached as Exh. 2. As administrator of James Bracken's estate, Plaintiff ultimately became the sole statutorily-

designated heir to Mr. Bracken's renewal rights once Vivian passed away in 1989. 17 U.S.C. § 304(a)(1)(C)(iii).

24. Plaintiff is the sole statutorily-designed heir to Bracken's termination rights since Bracken has no surviving spouses, children, or grandchildren, and since Plaintiff was the administrator of Bracken's estate. 17 U.S.C. § 304(c)(2).

25. As the sole heir to Mr. Bracken's termination rights and renewal rights, Mr. Carter has exercised his right to recapture the copyrights to various Bracken-written or co-written songs: 7 songs by way of termination in 2010, 33 songs by way of termination in 2012, and 10 songs by virtue of filing renewal copyright registrations in 1987, 1992, and 1993.

**The 2008 Notices of Termination**

26. On December 23, 2008, Plaintiff served ARC with Notices of Terminations for three Carter-authored songs ("the 2008 Carter Notices"): "Goodnight Sweetheart Goodnight," "Let's Make Up," and "House Cleaning" (collectively referred to herein as the "2008 Carter Copyrights"). Copies of the 2008 Carter Notices are attached as Exhs. 3-5.

27. In accordance with 17 U.S.C. § 304(c), Plaintiff (1) sent advance notice of termination in writing, (2) within the five-year period specified by the Copyright Act and not less than two or more than ten years before that date, (3) to the grantee/grantee's successor in title, (4) stating the effective date of termination, (5) signed by all those entitled to terminate the grant.

28. In further accordance with 17 U.S.C. 304(c) and 37 C.F.R. § 201.1, the 2008 Carter Notices contained: (1) a statement that the termination is being made under 17 U.S.C. § 304(c); (2) the name of each grantee/grantee's successor in title whose rights are being terminated, and each address at which service of the notice is being made; (3) the title and the name of at least one author of, and the date copyright was originally secured in, each work to

6

which the notice of termination applies; (4) a brief statement reasonably identifying the grant to which the notice of termination applies; (5) the effective date of termination; (6) the actual signature of each person entitled to exercise the right of termination; (7) a statement of the full name and address of that person; and (8) sent via certified mail, return receipt requested to the last known address (after a reasonable investigation) of the grantor/successor in title.

29.     On December 23, 2008, Plaintiff also served ARC with Notices of Termination for seven Bracken-authored songs ("2008 Bracken Notices"): "Baby It's You," "Bells Ring Out," "Own Me As Your Child," "Bounce," "Play It Cool," "Goodnight Sweetheart," and "Sloppy Drunk" (collectively referred to herein as the "2008 Bracken Copyrights").  Copies of the 2008 Bracken Notices are attached as Exhs. 6-12.

30.     In accordance with 17 U.S.C. § 304(c), Plaintiff (1) sent advance notice of termination in writing, (2) within the five-year period specified by the Copyright Act and not less than two or more than ten years before that date, (3) to the grantee/grantee's successor in title, (4) stating the effective date of termination, and (5) signed by all those entitled to terminate the grant.

31.     In further accordance with 17 U.S.C. 304(c) and 37 C.F.R. § 201.1, the 2008 Bracken Notices contained: (1) a statement that the termination is being made under 17 U.S.C. § 304(c); (2) the name of each grantee/grantee's successor in title whose rights are being terminated, and each address at which service of the notice is being made; (3) the title and the name of at least one author of, and the date copyright was originally secured  in, each work to which the notice of termination applies; (4) a brief statement reasonably identifying the grant to which the notice of termination applies; (5) the effective date of termination; (6) the actual signature of each person entitled to exercise the right of termination; (7) a statement of the full

name and address of that person; and (8) sent via certified mail, return receipt requested to the last known address (after a reasonable investigation) of the grantor/successor in title.

32.    The Effective Date of Termination of the 2008 Carter Copyrights and the 2008 Bracken Copyrights, as set forth in both the 2008 Carter and Bracken Notices, was December 31, 2010.  Exhs. 3-12.

**Plaintiff's Filing of the 2008 Notices of Termination with the Copyright Office**

33.    In late 2008, Plaintiff contacted Jay Ross ("Mr. Ross"), a well-known and highly regarded entertainment attorney in Chicago, to discuss Plaintiff's filing of the 2008 Carter and Bracken Notices of Termination ("Plaintiff's 2008 Notices").

34.    Mr. Ross represented the estate of James Thornton "Pookie" Hudson, who was a co-writer of one of the songs at issue, "Goodnight Sweetheart Goodnight."  Mr. Ross *did not represent* Plaintiff and *was not* Plaintiff's attorney of record for the 2008 Notices.  Plaintiff is specifically listed as the one and *only* contact person on all of Plaintiff's 2008 Notices.

35.    After talking to Mr. Ross, Plaintiff handled the Notices himself, mailing the 2008 Carter Notices and 2008 Bracken Notices to the Copyright Office in December of 2008 in accordance with 17 U.S.C. § 304(c)(4)(B) and 37 C.F.R. § 201.1.  The December 2008 mailing included a cover letter inquiring into the cost of the recordation fee because Plaintiff was unable to find any information about the requisite fee.

36.    Out of the glut of complex procedural requirements for terminating a copyright transfer, Plaintiff's December 2008 mailing to the Copyright Office was missing only the recordation fee and statements regarding the date and form of service of the Notices of Termination ("Statements of Service").  Ultimately, however, Plaintiff sent the recordation fees

and Statements of Service to the Copyright Office before the Effective Date of Termination on December 31, 2010.

**The Copyright Office's Mishandling of the 2008 Notices of Termination**

37.     On February 2, 2009, Robert Colton of the Copyright Office sent Mr. Ross a letter regarding not just the Notices of Termination Mr. Ross had filed for Hudson, but also Plaintiff's 2008 Notices.  The letter stated that the Copyright Office had not received any fees to record the Notices of Termination.  The letter mentioned nothing about Statements of Service.  A copy of the February 2, 2009 letter is attached as Exh. 13.

38.     On February 9, 2009, Mr. Ross and Plaintiff together re-sent the material returned by the Copyright Office, along with two checks, one in the amount of $120.00 for the recordation fees for the 2008 Carter Notices, and another one in the amount of $120.00 for the recordation fee for the 2008 Bracken Notices—in accordance with 37 C.F.R. § 201.3(c) (2008). See Letter from Copyright Office acknowledging Mr. Ross' letter attached as Exh. 14.

39.     In 2009 (when Plaintiff mailed his letter), 37 C.F.R. § 201.3 listed the fees for "Recordation of document" as $95 for a "single title" and an additional $25 for additional titles "per group of 10 titles."  See Exh. 15.

40.     Plaintiff calculated the 2008 Carter Notices recordation fees based on the fact that the 2008 Carter Notices stemmed from just one document (the 1965 Agreement) and there were only three Carter-authored titles submitted in the Carter group of titles ($95 + $25 = $120). Likewise, Plaintiff calculated the 2008 Bracken Notices recordation fee based on the fact the 2008 Bracken Notices stemmed from just one document (the 1965 Agreement) and there were only seven Bracken-authored titles submitted in the Bracken group of titles ($95 + $25 = $120).

41.     On April 20, 2009, Mr. Colton of the Copyright Office returned the 2008 Bracken Notices to Mr. Ross (again, not to Plaintiff), along with a letter now stating that there were two deficiencies to the Notices: (1) additional fees were required and (2) Plaintiff needed to submit a statement of the date and manner of service.  Exh. 14.  The proper recordation fee, Mr. Colton asserted, was $95 per Notice of Termination.   The April 20, 2009 letter from Mr. Colton did not contain the 2008 Carter Notices.

42.     On April 29, 2009, Plaintiff met with Mr. Ross and assisted Mr. Ross in drafting a response to the Copyright Office.  The response letter explicitly stated that Mr. Ross is only the contact person for the *Hudson Notices*, that the Copyright Office should contact Plaintiff regarding Plaintiff's 2008 Notices, and that Plaintiff did not understand why the Copyright Office only returned the seven 2008 Bracken Notices when, along with the seven Bracken Notices, three 2008 Carter Notices were also sent to the Copyright Office in December of 2008.  Exh. 16.

43.     Plaintiff watched Mr. Ross place the aforementioned letter, along with the proper Statements of Service for each Notice of Termination and a check for $545.00 ($665 for the seven 2008 Bracken Notices at $95 each minus the $120 already submitted for the 2008 Bracken Notices), in an envelope that Plaintiff sealed, walked to the post office, and then mailed via certified mail.

44.     The Copyright Office has admitted to receiving the April 29th envelope, as well as the response letter and Statements of Service contained therein; however, the Copyright Office lost Plaintiff's check for $545 and now claims it never received the check.    Plaintiff's bank statements show that there is a check number missing between two checks that were executed in

April of 2009.  See Exh. 17.  Additionally, Mr. Ross can independently verify that he placed the check in the envelope that Plaintiff sealed.  See Decl. Jay B. Ross.

45.     After sending the envelope containing the letter, the Statements of Service, and the check, Plaintiff received no further response from the Copyright Office and, therefore, reasonably believed that the 2008 Bracken Notices were properly recorded.  Because Plaintiff did not hear back from the Copyright Office regarding the 2008 Carter Notices he had mailed in December of 2008, he believed those Notices were properly filed and recorded as well.  In short, Plaintiff did everything that he could do or be reasonably expected to do to properly file the Notices of Termination with the Copyright Office.

46.     In approximately May of 2012, Plaintiff was prompted to contact the Copyright Office due to a third party request for copies of Plaintiff's 2008 Notices.  It was then that Plaintiff learned for the first time that the Copyright Office had not properly filed certificates of recordation for Plaintiff's 2008 Notices in April of 2009.

47.     The Copyright Office requested that Plaintiff forward copies of Plaintiff's 2008 Notices and proof of certified mailings.  After receipt of Plaintiff's documentation, the Copyright Office informed Plaintiff that the $240.00 submitted on his behalf by Mr. Ross was processed by the Copyright Office; however, the Copyright Office stated that it had no record of the subsequent payment made by Plaintiff outlined in Mr. Ross's April 29, 2009 letter.  The Copyright Office informed Plaintiff that he owed $1,050.00 for the recordation fee for Plaintiff's 2008 Notices.  See Exh. 18.

48.     But for the Copyright Office's ambiguous fee schedule, the Copyright Office's misplacing of Plaintiff's check for $545.00, as well as the Copyright Office's lack of notice of

11

the payment deficiency after April of 2009, Plaintiff's 2008 Bracken Notices would have been recorded before the December 31, 2010 Effective Date of Termination.

49. Additionally, but for the Copyright Office's failure to give Plaintiff any notice about any deficiencies regarding Plaintiff's 2008 Carter Notices, Plaintiff's 2008 Carter Notices would have been recorded before the December 31, 2010 Effective Date of Termination.

50. Nevertheless, on May 30, 2012, Plaintiff attempted to remedy the Copyright Office's errors by providing the Copyright Office with a payment for the recordation fee of Plaintiff's 2008 Notices in the amount of $1,050.00 along with the other documents the Copyright Office requested. Exh. 18. The Copyright Office did not credit Plaintiff's original payment of $240 and charged Plaintiff the new fee of $105 per Notice (instead of the 2009 rate of $95 per Notice).

51. On August 22, 2012, the Copyright Office provided Plaintiff with Certificates of Recordation for Plaintiff's 2008 Notices for "House Cleaning" (Exh. 5), "Baby It's You" (Exh. 6), "Bells Ring Out" (Exh. 7), "Own Me As Your Child" (Exh. 8), and "Bounce" (Exh. 9).

52. On September 6, 2012, the Copyright Office provided Plaintiff with Certificates of Recordation for Plaintiff's 2008 Notices for "Goodnight Sweetheart, Goodnight" (Exh. 3), "Let's Make Up" (Exh. 4), "Play It Cool" (Exh. 10), "Goodnight Sweetheart" (Exh. 11), and "Sloppy Drunk" (Exh. 12).

53. The Copyright Office originally indexed Plaintiff's 2008 Notices on the Copyright Office's online Public Catalog as "Notices of Termination." See February 23, 2016 correspondence from the Copyright Office attached as Exh. 19.

54. Since May 28, 2015, after BMG (as administrator of and on behalf of ARC and Fuji) refused to acknowledge Plaintiff's 2008 Notices as valid, Plaintiff has exhaustively

corresponded with the Copyright Office and provided it with an abundance of information regarding the Copyright's errors in recording Plaintiff's 2008 Notices. However, the Copyright Office has refused to change the recordation dates for Plaintiff's 2008 Notices; instead, the Copyright Office altered its records to re-categorize Plaintiff's 2008 Notices as "documents pertaining to copyright" (instead of terminations) and now considers Plaintiff's matter closed. See February 23, 2016 and March 18, 2016 letters attached as Exh. 19 and Exh. 20.

**The 2012 Notices of Termination**

55.     On December 28, 2012, Plaintiff served ARC with Notices of Termination ("the 2012 Carter Notices") for 36 Carter-authored songs, "Be My Only Love," "Boom Diddy Boom," "Come On Home," "Crazee Babee," "Cry Over Me," "Cubop Chebop," "Dance On," "Do Wah," "Don Cha Go," "Everybody But Me," "Everyone's Laughing," "I Aint Got You," "I Like It Like That," "I'll Always Be True," "I Lost You," "I'm Gonna Ruin You," "I Need Your Kisses," "IOU," "If You Don't Want Me No More," "It's In The Bag," "Jo Jo," "Left Field," "Olly Olly Asten Free," "One Two Cha Cha Cha," "Quarter Party," "Road House," "Rock N Roll Mama," "Rockin It Is," "Seven Nights," "Stop," "Sun Is Shining," "The Convention," "Tina," "Wish I Was In School," "You Better Believe It," and "You're Something Else" (collectively referred to herein as the "2012 Carter Copyrights"). Copies of the 2012 Carter Notices are attached as Group Exh. 21.

56.     In accordance with 17 U.S.C. § 304(c), Plaintiff (1) sent advance notice of the termination in writing, (2) within the five-year period specified by the Copyright Act and not less than two or more than ten years before that date, (3) to the grantee/grantee's successor in title, (4) stating the effective date of termination, and (5) signed by all those entitled to terminate the grant.  See Group Exh. 21.

57.     In further accordance with 17 U.S.C. 304(c) and 37 C.F.R. § 201.1, the 2012 Carter Notices contained: (1) a statement that the termination is being made under 17 U.S.C. § 304(c); (2) the name of each grantee/grantee's successor in title whose rights are being terminated, and each address at which service of the notice is being made; (3) the title and the name of at least one author of, and the date copyright was originally secured in, each work to which the notice of termination applies; (4) a brief statement reasonably identifying the grant to which the notice of termination applies; (5) the effective date of termination; (6) the actual signature of each person entitled to exercise the right of termination; (7) a statement of the full name and address of that person; and (8) sent via certified mail, return receipt requested to the last known address (after a reasonable investigation) of the grantor/successor in title.  See Group Exh. 21.

58.     Additionally, on December 27, 2012, Plaintiff served ARC with Notices of Termination for 33 Bracken-authored songs ("the 2012 Bracken Notices"), namely, "Baby Lee," "Baby Wont You," "By and By I'll Understand," "Certain Someone," "Cubop Chebop," "Dimples," "Each and Every Night," "Everybody's Rockin," "God's Wonderful Love," "He's Coming Back," "I Do," "I'm So Excited," "I'm So Worried Baby," "I See You When You're Weak," "I Want To Be A Christian," "It's Really Really You," "Keep Your Arms Around Me," "Little Wheel," "Mandella," "Mean Ole Spider," "My Gal Keeps Me Crying," "My Heart Remembers," "Patty," "Please Be Mine," "Road Is So Rough," "Rock This Joint," "Rosie Mae," "Where Is My Mother," "Why Won't You Dance," "You Can Lead Me Baby," "You Gave Me Peace Of Mind," "Yours And Mine," and "You've Got To Walk It" (collectively referred to herein as the "2012 Bracken Copyrights").  Copies of three of the 2012 Bracken Notices are attached as Exhs. 22-24.

59.    In accordance with 17 U.S.C. § 304(c), Plaintiff (1) sent advance notice of the termination in writing, (2) within the five-year period specified by the Copyright Act and not less than two or more than ten years before that date, (3) to the grantee/grantee's successor in title, (4) stating the effective date of termination, (5) signed by all those entitled to terminate the grant (6) by certified mail, return receipt requested.  See Exhs. 22-24.

60.    In further accordance with 17 U.S.C. 304(c) and 37 C.F.R. § 201.1, the 2012 Carter Notices contained: (1) a statement that the termination is being made under 17 U.S.C. § 304(c); (2) the name of each grantee/grantee's successor in title whose rights are being terminated, and each address at which service of the notice is being made; (3) the title and the name of at least one author of, and the date copyright was originally secured in, each work to which the notice of termination applies; (4) a brief statement reasonably identifying the grant to which the notice of termination applies; (5) the effective date of termination; (6) the actual signature of each person entitled to exercise the right of termination; (7) a statement of the full name and address of that person; and (8) sent via certified mail, return receipt requested to the last known address (after a reasonable investigation) of the grantor/successor in title.  See Exhs. 22-24.

61.    The Effective Date of Termination of the 2012 Carter Notices and the 2012 Bracken Notices (except for "My Gal Keeps Me Crying," which was December 31, 2015) was December 31, 2014.  Group Exh. 21 and Exh. 22-24.

62.    In 2012, Plaintiff mailed the 2012 Carter Notices and the 2012 Bracken Notices, along with the proper Statements of Service and recordation fees, to the Copyright Office.

63.     The Register of Copyrights certified, on the Certificates of Registration, that the 2012 Carter Notices and the 2012 Bracken Notices were properly recorded and publicly accessible on March 14, 2013.  See Group Exh. 21 and Exh. 22-24.

**BMG's Refusal to Recognize or Respect the 2012 Carter and Bracken Notices**

64.     ARC acquired the rights to the 2012 Carter Copyrights and the 2012 Bracken Copyrights by virtue of an Agreement dated November 19, 1965 by and between Conrad Publishing Co., Inc. (Bracken's company), Tollie Music, Inc. (Carter's company) and Arc Music Corp. (which is administered by BMG).  ARC paid $185,000.00 for essentially the entire Carter and Bracken catalog of songs—encompassing hundreds of copyrights.

65.     Even though BMG (as administrator of and on behalf of ARC and Fuji) was given two years under the law from the time being served the 2012 Notices of Termination to prepare for the relinquishment of rights, and even though BMG (as administrator of and on behalf of ARC and Fuji) had over a year and a half from the time the Copyright Office filed the Notices of Termination to assess their validity, BMG (as administrator of and on behalf of ARC and Fuji) nevertheless refused to recognize Plaintiff's rights in the songs on the Effective date of Termination, December 31, 2014.

66.     Indeed, BMG (as administrator of and on behalf of ARC and Fuji) initially refused to recognize or respect Plaintiff's rights to all 36 songs contained in the 2012 Carter Notices and all 33 songs contained in the 2012 Bracken Notices.

67.     Not until March of 2015 did BMG (as administrator of and on behalf of ARC and Fuji) first recognize in writing Plaintiff's rights to 30 of the 33 songs included in the 2012 Bracken Notices.  However, BMG (as administrator of and on behalf of ARC and Fuji) continued to refuse to recognize Plaintiff's rights in "Cubop Chebop," "My Gal Keeps Me

Crying," and "Baby Lee." See letter to Zac Centers attached to email string in Group Exh. 25 and Group Exh. 26. These three songs, not coincidentally, were among the biggest income generators of the songs subject to 2012 Bracken Notices. BMG (as administrator of and on behalf of ARC and Fuji) also continued to refuse to recognize or respect Plaintiff's rights in all 36 songs contained in the 2012 Carter Notices.

68. From January 1, 2015 to April 17, 2015, BMG (as administrator of and on behalf of ARC and Fuji) falsely represented and held itself out to third parties as owning rights to 69 of Plaintiff's copyrighted songs, including the 33 songs subject to the 2012 Bracken Notices that BMG (as administrator of and on behalf of ARC and Fuji) today admits were validly reclaimed by Plaintiff on the Effective Date of December 31, 2014. See Defs.' Mot. Dismiss, Dkt. No. 20, Pages 4-5.

69. BMG (as administrator of and on behalf of ARC and Fuji), without Plaintiff's authorization or consent, represented to numerous third parties it could license—and did license to those third parties—the performance rights and other rights to Plaintiff's copyrighted songs.

70. Numerous third parties—relying on BMG's representations and without Plaintiff's authorization—publicly performed, reproduced, and distributed Plaintiff's copyrighted songs. See Exh. 27.

71. BMG, ARC, and Fuji directly benefited from this third-party infringement by collecting and retaining royalties flowing from the unlawful and infringing conduct. See Exh. 27.

72. Additionally, for the songs "Cubop Chebop" and "Baby Lee," BMG (as administrator of and on behalf of ARC and Fuji) refused to recognize that the 2012 Bracken Notices terminated BMG/ARC/Fuji's rights to the songs by falsely stating that the "online

records at the Copyright Office do not show that the termination for the songs . . . were recorded." See Group Exh. 26. BMG has also refused to recognize Plaintiff's rights in the song "My Gal Keeps Me Crying" by wrongly claiming that the Notice at issue was served and recorded prior to the five-year termination window for that song. Exh. 23.

73. However, Plaintiff properly terminated the copyright to "My Gal Keeps Me Crying," "Cubop Chebop," and "Baby Lee." The song "My Gal Keeps Crying" was copyrighted in October of 1959. The Effective Date on the Notice was 56 years and two months after the song was registered (December 21, 2015) and the Notice of Termination was served less than ten years before that date (December 27, 2012). Accordingly, the Register of Copyrights certified, on the Certificate of Recordation, that the Notice of Termination for "My Gal Keeps Me Crying" was properly recorded on March 14, 2013, with an Effective Date of December 31, 2015. Exh. 23. Furthermore, the Notices of Termination for "Cubop Chebop" and "Baby Lee" were properly recorded by the Copyright Office on March 14, 2013 and have been publicly accessible on the Copyright Office's database since March 14, 2013. See Exs. 22, 24.

74. BMG did not recognize in writing Plaintiff's rights to "My Gal Keeps Me Crying," "Cubop Chebop," and "Baby Lee" until September of 2016. Although in March of 2016, BMG (as administrator of and on behalf of ARC and Fuji) recognized in an email to Broadcast Music, Inc. Plaintiff's rights to the three songs (along with the 36 songs subject to the 2012 Carter Notices), Plaintiff was not privy to this email and BMG (as administrator of and on behalf of ARC and Fuji) continued to represent to third parties it had the rights to license and did license the performance rights to these copyrighted songs without Plaintiff's authorization or consent. BMG's royalty statements show it continued to license the copyrighted songs to third parties well into June of 2016. See Exh. 27.

18

75. BMG (as administrator of and on behalf of ARC and Fuji) has, without Plaintiff's authorization or consent, represented to numerous third parties it could license—and did license to third parties—the performance rights and other rights to "My Gal Keeps Me Crying," "Cubop Chebop," and "Baby Lee."

76. Numerous third parties—relying on BMG's representations and without Plaintiff's authorization—publicly performed, reproduced, and distributed Plaintiff's copyrighted songs. BMG, ARC, and Fuji directly benefited from this third-party infringement by collecting and retaining royalties flowing from the infringing conduct. As the result of BMG's conduct, Plaintiff and his family have been denied tens of thousands (possible hundreds of thousands) of dollars of royalty payments.

77. Additionally, from January 1, 2015 to the present, BMG (as administrator of and on behalf of ARC and Fuji) falsely represented and held itself out to third parties as owning rights to 36 of Plaintiff's Copyrighted Songs (the 36 subject to the 2012 Carter Notices) that BMG/ARC/Fuji knew or should have known Plaintiff validly reclaimed on the Effective Date of December 31, 2014.

78. BMG (as administrator of and on behalf of ARC and Fuji) has, without Plaintiff's authorization or consent, represented to numerous third parties it could license—and did license to third parties—the performance rights and other rights to Plaintiff's 36 copyrighted songs.

79. Numerous third parties—relying on BMG's representations and without Plaintiff's authorization—publicly performed, reproduced, and distributed Plaintiff's copyrighted songs.

80. BMG, ARC, and Fuji directly benefited from this third-party infringement by collecting and retaining royalties flowing from the infringing conduct. As the result of BMG's

19

conduct, Plaintiff and his family have been denied tens of thousands (possible hundreds of thousands) of dollars of royalty payments.

**BMG Refuses to Recognize Carter Works Recaptured by Plaintiff through Renewal**

81.     Mr. Calvin Carter died in 1986, before the renewal rights to several of his copyrighted works vested.

82.     Mr. Calvin Carter's contingent renewal rights passed to Plaintiff and his brother (the statutorily-designated heirs) and ultimately vested at the end of the first term of the copyrighted works listed in the table below.

83.     In accordance with their renewal rights, Plaintiff and his brother in the late 1980's and early 1990's filed renewal registrations with the Copyright Office (the "Carter Renewal Registrations") in order to recapture rights to the works listed in the table below—which were formerly claimed by Conrad Publishing Co., Inc. and thereafter acquired by ARC in 1965. A copy of each Form RE is attached as Group Exh. 28.

| Effective Date of Renewal Registration | Name of Work | Authors |
| --- | --- | --- |
| December 30, 1988 | A Lonely Soldier | Calvin Carter |
| December 30, 1993 | Burnin' | Calvin Carter, Bill Sheppard |
| December 30, 1988 | Cling A Ling | Calvin Carter, Marion Oliver |
| December 30, 1986 | Cry Over Me | Calvin Carter, J.L. Robinson |
| April 13, 1989 | Don't Tell Nobody | Calvin Carter, Verne Allison, Chuck Barksdale |
| December 29, 1989 | Don't Walk Away From Me | Calvin Carter, Horace Ott |
| December 30, 1988 | He Will Break Your Heart | Calvin Carter, Jerry Butler, Curtis Mayfield |
| December 30, 1988 | Hum Bug | Calvin Carter, R. Volz, R.F. Wernsman |
| December 28, 1990 | I Don't Want to Hear The Truth | Calvin Carter, Bernice Williams |
| March 8, 1989 | I'll Never Break Your Heart | Curtis Mayfield, Jerry Butler, Calvin Carter, Joe Tex |
| December 30, 1993 | I'm That Man Down There | Calvin Carter, Mary Reed |
| August 9, 1991 | It Just Ain't Right | Richard Parker and Calvin Carter |
| December 30, 1988 | Mother-in-Law | Calvin Carter, Marion Oliver |
| December 30, 1992 | Shake It | Calvin Carter, John Cruickshank |
| December 30, 1988 | Shoo-B-Doo-B-Doo | Calvin Carter, Clyde Walker |
| April 13, 1989 | Swingin' Teens | Calvin Carter, Verne Allison, Chuck Barksdale |
| December 30, 1988 | The Mix | Calvin Carter, R. Volz, R.F. Wernsman |
| May 2, 1991 | Uh Ooo Ooo Wee | Richard Parker, Calvin Carter |
| May 25, 1990 | Walk on with the Duke | Bernise Williams, Earl Edwards, Eugene Dixon, Testa, Spano, Finozio, Irv Nahan, Calvin Carter, Prirollo |

| Effective Date of Renewal Registration | Name of Work | Authors |
|---|---|---|
| January 2, 1992 | What Do We Prove | Larry Graves, Calvin Carter, The Dells: Verne Allison, M. McGill, J. Carter, C. Barksdale, Marvin Junior |
| February 16, 1989 | Your Friends | Dee Clark, Calvin Carter |
| December 30, 1988 | You're Looking Good | Calvin Carter, Marion Oliver |

84.     The works described in the chart above are collectively referred to herein as the "Carter Renewed Copyrights."

85.     From December 30, 1986 to the present, BMG (as administrator of and on behalf of ARC and Fuji) has falsely represented and held itself out to third parties as owning rights to the Carter Renewed Copyrights that it knew or should have known Plaintiff validly reclaimed on the dates listed in the chart above.  Although on October 18, 2016 ARC/Conrad officially "relinquished" its rights in "Don't Walk Away From Me," "I Don't Want to Hear The Truth," "I'm That Man Down There," "Swingin' Teens," "Your Friends," and Walk On With The Duke," ARC/Conrad and BMG has not answered for it tortious conduct from 86 until October 18, 2016.

86.     BMG (as administrator of and on behalf of ARC and Fuji) has, without Plaintiff's authorization or consent, represented to numerous third parties it could license—and did license to third parties—the performance rights and other rights to Carter Renewed Copyrights.

87.     Numerous third parties—relying on BMG's representations and without Plaintiff's authorization—publicly performed, reproduced, and distributed Plaintiff's copyrighted songs.

88.     BMG, ARC, and Fuji directly benefited from this third-party infringement by collecting and retaining royalties flowing from the infringing conduct. As the result of BMG's

conduct, Plaintiff and his family have been denied tens of thousands (possible hundreds of thousands) of dollars of royalty payments.

**BMG Refusal to Recognize Bracken Works Recaptured by Plaintiff through Renewal**

89.     Mr. James Bracken died in 1972, before the renewal rights to any of his copyrighted works vested.

90.     Mr. James Bracken's contingent renewal rights ultimately passed to Plaintiff (the statutorily designated heir as executor of Bracken's estate) and eventually vested at the end of the first term of the copyrighted works listed in the table below.

91.     In accordance with his renewal rights, Plaintiff in the early 1990's filed renewal registrations with the Copyright Office (the "Bracken Renewal Registrations") in order to recapture rights to the works listed in the table below—which were formerly claimed by Conrad Publishing Co., Inc. (and later acquired by ARC).  Vivian Bracken filed the 1987 renewal registration.  A copy of each Form RE is attached as Group Exh. 29.

| Effective Date of Renewal Registration | Name of Work | Authors |
|---|---|---|
| December 30, 1992 | All In The Game | James Bracken |
| December 30, 1993 | Gerald's Blues | James Bracken, Gerald Gregory |
| December 30, 1992 | Give It Up | James Bracken |
| December 30, 1992 | Keep On | James Bracken |
| December 30, 1992 | Let's Face It Baby | James Bracken |
| December 30, 1992 | Mr. Satan | James Bracken |
| December 30, 1992 | My Little Doggie | James Bracken |
| April 17, 1987 | Steppin' Out | James Bracken |
| December 30, 1992 | The Old Account Was Settled | James Bracken |
| December 30, 1992 | You Got To Know | James Bracken |

92.     The works described in the chart above are collectively referred to herein as the "Bracken Renewed Copyrights."

93.     From December 30, 1992 (April 17, 1987 for "Steppin' Out") to the present, BMG (as administrator of and on behalf of ARC and Fuji) has falsely represented and held itself

out to third parties as owning rights to the Bracken Renewed Copyrights that it knew or should have known Plaintiff validly reclaimed on each of the dates listed in the chart above. Although on October 18, 2016 ARC/Conrad officially "relinquished" its rights in "All In The Game," "Gerald's Blues," "Give It Up," "Keep On," "Let's Face It Baby,""Mr. Satan," "My Little Doggie," "The Old Account Was Settled," "You Got To Know," ARC/Conrad and BMG has not answered for it tortious conduct from 1992 until October 18, 2016.

94.  BMG (as administrator of and on behalf of ARC and Fuji) has, without Plaintiff's authorization or consent, represented to numerous third parties that it could license—and did license to third parties—the performance rights and other rights to Bracken Renewed Copyrights.

95.  Numerous third parties—relying on BMG's representations and without Plaintiff's authorization—publicly performed, reproduced, and distributed Plaintiff's copyrighted songs.

96.  BMG, ARC, and Fuji directly benefited from this third-party infringement by collecting and retaining royalties flowing from the infringing conduct.

97.  BMG, as administrator of, and on behalf of ARC and Fuji, has failed to provide, and continues to refuse to provide, Plaintiff with fair and accurate reports of the domestic and foreign royalties due to Plaintiff for the BMG Bracken Copyrights as well as those royalties. As the result of BMG's conduct, Plaintiff and his family have been denied tens of thousands (possible hundreds of thousands) of dollars of royalty payments.

**BMG's Failure to Pay Plaintiff Royalties**

98.  BMG, as administrator of, and on behalf of ARC and Fuji, refuses to remit domestic and foreign royalties to Plaintiff for the following songs, which were written or co-written by Bracken: "All in the Game," "Baby Lee," "Bounce," "By and By, I'll Understand,"

"Certain Someone," "Come Love," "Cubop Chebop," "Dimples," "Each and Every Night," "Everybody's Rockin'," "Found My Baby Gone," "Gerald's Blues." "Give It Up," "God's Wonderful Love," "He's Coming Back," "High and Lonesome," "I Do," "I See You When You're Weak," "I Want To Be A Christian," "I'm So Excited," "I'm So Worried Baby," "It's Really Really You," "Keep On," "Keep Your Arms Around Me," "Let's Face It Baby" "Little Wheel," "Mandella," "Mean Ole Spider," "Mr. Satan," "My Gal Keeps Me Crying," "My Little Doggie," "My Heart Remembers," "Patty," "Please Be Mine," "The Road Is So Rough," "Rock This Joint," "Rosie Mae," "Steppin' Out," "Stop," "Surely I Love You," "The Old Account Was Settled," "Unfriendly Woman," "Where is My Mother," "Why Won't You Dance," "You Can Lead Me Baby," "You Got To Know," "Yours and Mine," and "You've Got To Walk It" (collectively, the "BMG Bracken Copyrights").

99.     BMG, as administrator of, and on behalf of ARC and Fuji, failed to, and continues to fail to, provide Plaintiff with fair and accurate reports of the domestic and foreign royalties due Plaintiff for the BMG Bracken Copyrights, and failed to, and continues to fail to, pay Plaintiff all of the domestic and foreign royalties owed to him (the "Bracken Royalties").

**Count I**
**REVIEW OF FINAL AGENCY DECISION**
**5 U.S.C. § 701-706**
**(Register of Copyrights)**

100.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 99 as if fully set forth herein.

101.    Plaintiff has exhausted his administrative remedies, and is dissatisfied with the Register of Copyright's certification, on the Certificates of Recordation, that the date of recordation of Plaintiff's 2008 Notices of Termination is June 1, 2012, instead of April 29, 2009.

102.    Plaintiff is entitled to a review of Plaintiff's 2008 Notices and corresponding records before Register of Copyrights, as well as an opportunity to conduct discovery and present additional evidence and argumentation as to why Plaintiff's 2008 Notices warrant the Register of Copyright's certification, on Certificates of Recordation, that the date of recordation of Plaintiff's 2008 Notices is or should be April 29, 2009.

103.    Register of Copyright's actions have wrongfully deprived Plaintiff of his right to terminate the copyrights to the songs "Goodnight Sweetheart Goodnight," "Let's Make Up," and "House Cleaning," written by Mr. Calvin Carter,  and "Baby It's You," "Bells Ring Out," "Own Me As Your Child," "Bounce," "Play It Cool," "Goodnight Sweetheart," and "Sloppy Drunk" written by Mr. James Bracken with the Copyright Office.

WHEREFORE, Plaintiff respectfully requests this Court to:

A.    Reverse and vacate Register of Copyright's final determination that the Certificates of Recordation for Plaintiff's 2008 Notices have a recordation date as June 1, 2012.

B.    Reverse and vacate Register of Copyright's final decision to re-index Plaintiff's 2008 Notices to "documents pertaining to copyright:"

C.    Order Register of Copyright to certify, on revised Certificates of Recordation, that the recordation dates for Plaintiff's 2008 Notices is April 29, 2009;

D.    Update any and all records kept by the Copyright Office to state that Plaintiff's 2008 Notices are "notices of termination," and have a recordation date of April 29, 2009;

E.    Compensate Plaintiff for the loss of royalties and other monies due to the Copyright Office's negligence and error; and

F.    Grant Plaintiff all other relief that this Court deems appropriate and permissible

## COUNT II
## FEDERAL COPYRIGHT INFRINGEMENT
### (17 U.S.C. §§ 101, et seq.)
### (BMG, ARC, Fuji)

104.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 103 as if fully set forth herein.

105.     Under the Copyright Act, "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author, as the case may be." 17 U.S.C. § 501.

106.     Plaintiff owns rights to the 101 songs subject to the 2012 Carter Notices, the 2012 Bracken Notices, the Carter Renewals, and the Bracken Renewals ("Plaintiff's Copyrighted Songs").

107.     BMG, ARC and Fuji knew that they did not have a valid license to reproduce, publish, distribute, display, broadcast, or otherwise publicly perform Plaintiff's Copyrighted Songs.

108.     On information and belief, BMG, ARC and Fuji reproduced, published, distributed, displayed, broadcasted, and/or publicly performed Plaintiff's Copyrighted Songs.

109.     The infringing acts of BMG, ARC and Fuji have been willful and deliberate, and in utter disregard for Plaintiff's rights.

110.     As a direct and proximate result of the wrongful conduct of BMG, ARC and Fuji, Plaintiff has been damaged, and BMG, ARC and Fuji have realized financial gains and reaped benefits that rightfully belong to Plaintiff.

WHEREFORE, Plaintiff respectfully requests this Court to:

A.     Permanently enjoin BMG, ARC, Fuji and their respective officers, directors, member, managers, agents, servants, employees, representatives, attorneys, related companies,

successors, assigns, and all others in active concert or participation with them, from reproducing, publishing, distributing, displaying, broadcasting, or otherwise publicly performing Plaintiff's Copyrights Songs in any manner;

B.    Award Plaintiff damages in an amount to be determined at trial, including willful statutory damages in the amount of $150,000 per infringing work, or in the alternative, (i) actual damages; (ii) profits BMG, ARC and Fuji made from the infringing conduct; (iii) the benefit to BMG, ARC and Fuji from the infringing conduct; and (iv) all other damages attributable to the infringement by BMG, ARC and Fuji to which Plaintiff is entitled under 17 U.S.C. §504;

C.    Award prejudgment interest to Plaintiff;

D.    Award Plaintiff his reasonable attorney's fees and costs under 17 U.S.C. §505;

E.    Award such other relief to which Plaintiff is entitled under the Copyright Act; and

F.    Award such other relief that this Court deems just and proper.

### COUNT III
### CONTRIBUTORY COPYRIGHT INFRINGEMENT
### (BMG, ARC, Fuji)

111.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 110 as if fully set forth herein.

112.    BMG (as administrator of and on behalf of ARC and Fuji) represented to third parties that it has certain rights to the Plaintiff's Copyrighted Songs when it knew or should have known that Plaintiff owned the rights to those songs by way of properly filed Notices of Termination and Renewals.

113.    BMG (as administrator of and on behalf of ARC and Fuji) materially induced and caused third parties to, among other things, publicly perform Plaintiff's Copyrighted Songs by virtue of a licensing agreement.

27

114.    BMG (as administrator of and on behalf of ARC and Fuji) knew that its licensees were, among other things, publicly performing Plaintiff's Copyrighted Songs.

115.    BMG (as administrator of and on behalf of ARC and Fuji) knowingly and purposely benefited from its licensees' copyright infringement by way of licensing fees and royalties.

WHEREFORE, Plaintiff respectfully requests the following relief against Defendants:

A.    Permanently enjoin BMG, ARC, Fuji and their respective officers, directors, member, managers, agents, servants, employees, representatives, attorneys, related companies, successors, assigns, and all others in active concert or participation with them, from claiming it has rights to Plaintiff's Copyrighted songs and from licensing to third parties the performance rights and other rights to Plaintiff's Copyrighted Songs;

B.    Award Plaintiff damages in an amount to be determined at trial, including willful statutory damages in the amount of $150,000 per infringing work, or in the alternative, (i) actual damages; (ii) profits BMG, ARC and Fuji made from the infringing conduct; (iii) the benefit to BMG, ARC and Fuji from the infringing conduct; and (iv) all other damages attributable to the infringement by BMG, ARC and Fuji to which Plaintiff is entitled under 17 U.S.C. §504;

C.    Award prejudgment interest to Plaintiff;

D.    Award Plaintiff his reasonable attorney's fees and costs under 17 U.S.C. §505;

E.    Award such other relief to which Plaintiff is entitled under the Copyright Act; and

F.    Award such other relief that this Court deems just and proper.

<u>COUNT IV</u>
**VICARIOUS COPYRIGHT INFRINGEMENT**
**(BMG, ARC, Fuji)**

116.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 115 as if fully set forth herein.

117.    BMG (as administrator of and on behalf of ARC and Fuji) exercised control over numerous third parties' conduct by means of a detailed and restrictive licensing agreement.

118.    The aforementioned third parties infringed on Plaintiff's Copyrighted Songs by, among other things, publicly performing those songs without Plaintiff's authorization or consent.

119.    BMG, as administrator of, and on behalf of ARC and Fuji, received and still receives a direct financial benefit from the third parties' infringing conduct in the form of royalty payments and promotional goodwill.

WHEREFORE, Plaintiff respectfully requests the following relief against Defendants:

A.    Permanently enjoin BMG, ARC, Fuji and their respective officers, directors, member, managers, agents, servants, employees, representatives, attorneys, related companies, successors, assigns, and all others in active concert or participation with them, from licensing to third parties the performance rights and other rights to Plaintiff's Copyrighted Songs;

B.    Award Plaintiff damages in an amount to be determined at trial, including willful statutory damages in the amount of $150,000 per infringing work, or in the alternative, (i) actual damages; (ii) profits BMG, ARC and Fuji made from the infringing conduct; (iii) the benefit to BMG, ARC and Fuji from the infringing conduct; and (iv) all other damages attributable to the infringement by BMG, ARC and Fuji to which Plaintiff is entitled under 17 U.S.C. §504;

C.    Award prejudgment interest to Plaintiff;

D.    Award Plaintiff his reasonable attorney's fees and costs under 17 U.S.C. §505;

E.     Award such other relief to which Plaintiff is entitled under the Copyright Act; and

F.     Award such other relief that this Court deems just and proper.

## COUNT V
## FALSIFICATION OF COPYRIGHT MANAGEMENT INFORMATION
## (17 U.S.C. § 1202)
## (BMG, ARC, Fuji)

120.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 119 as if fully set forth herein.

121.     Defendants provided false copyright management information to third parties, including false information about the name of, and other identifying information about, the copyright owner of the work, as well as about terms and conditions for use of the work.  17 U.S.C. § 1202(a)(1);  17 U.S.C. § 1202(c)(3),(6).

122.     Defendants' falsification of copyright management information was made without Plaintiff's knowledge or authority.

123.     Defendants' falsification of copyright management information was done intentionally, knowingly, and with the intent to induce, enable, and facilitate copyright infringement of Plaintiff's Copyrighted Songs.  17 U.S.C. § 1202(a).

WHEREFORE, Plaintiff respectfully requests the following relief against Defendants:

A.     Permanently enjoin BMG, ARC, Fuji and their respective officers, directors, member, managers, agents, servants, employees, representatives, attorneys, related companies, successors, assigns, and all others in active concert or participation with them, from providing false copyright management information to third parties;

B.     Award Plaintiff statutory damages pursuant to 17 U.S.C. § 1203(c)(3) in the sum of $25,000 from each Defendant for each violation of § 1202 or, alternatively, damages in an amount to be determined at trial, including (i) actual damages; (ii) profits BMG, ARC and Fuji

made from the infringing conduct; (iii) the benefit to BMG, ARC and Fuji from the infringing

conduct; and (iv) all other damages attributable to the infringement by BMG, ARC and Fuji;

      C.     Award prejudgment interest and costs to Plaintiff;

      D.     Award Plaintiff his reasonable attorney's fees and costs;

      E.     Award such other relief to which Plaintiff is entitled under the Copyright Act; and

      F.     Award such other relief that this Court deems just and proper.

**COUNT VI (IN THE ALTERNATIVE)**
**UNJUST ENRICHMENT**
**(BMG, ARC, Fuji)**

124.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through

123 as if fully set forth herein.

125.    BMG (as administrator of and on behalf of ARC and Fuji) without Plaintiff's

authorization licensed to numerous third parties the performance rights and other rights to

Plaintiff's Copyrights Songs.

126.    BMG (as administrator of and on behalf of ARC and Fuji) unlawfully received

and continues to unlawfully receive royalties and other monetary benefits from such

unauthorized licenses.

127.    BMG (as administrator of and on behalf of ARC and Fuji) also unlawfully retains

foreign and domestic royalties for numerous Bracken-authored or co-authored songs.

128.    BMG's acts, undertaken on behalf of ARC and Fuji, have impoverished and

continue to impoverish Plaintiff, including by Plaintiff's loss of licensing revenue and a dilution

and diminution in the value of Plaintiff's licenses.

129.    But for BMG's (and ARC's and Fuji's) wrongful acts, Plaintiff would not have

lost licensing revenue and endured a dilution and diminution in the value of its licenses and

BMG (and ARC and Fuji) would not have gained revenue and benefited from licensing Plaintiff's Copyrighted Songs.

130.    Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff prays that this Honorable Court enter an order and judgment in its favor and against BMG, ARC, and Fuji that includes the following:

A.    A full and true accounting of BMG's/ARC's/Fuji's licensing of and revenue from Plaintiff's Copyrighted Songs since 1986;

B.    BMG's/ARC's/Fuji's profits and other monetary benefits associated with the commercial exploitation of Plaintiff's Copyrighted Songs, in an amount    to be determined at trial but in no event less than $100,000;

C.    Both pre-judgment and post-judgment interest;

D.    Attorneys' fees and costs; and

E.    Such other and further relief as this Court finds just and equitable.

## COUNT VII
## DECEPTIVE TRADE PRACTICES
### (BMG, ARC, Fuji)

131.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 130 as if fully set forth herein.

132.    BMG (as administrator of and on behalf of ARC and Fuji), in and through various licenses and license negotiations and advertising material, employed deception and misrepresentations of material facts—namely, falsely representing that it had the rights to license Plaintiff's Copyright Songs when it did not have such rights—with the intent that third parties (Illinois and non-Illinois consumers and businesses) would rely on this deception and concealment of material facts in purchasing licenses to Plaintiff's Copyrighted Songs.

133.   BMG, ARC's and Fuji's false representations proximately caused injury to Illinois consumers and to Plaintiff.

WHEREFORE, Plaintiff prays that this Honorable Court enter an order and judgment in favor of Plaintiff and against Defendants BMG, ARC, and Fuji as follows:

A.   For damages to Illinois consumers and Plaintiff, in an amount to be determined at trial, but in no event less than $100,000.

B.   Both pre-judgment and post-judgment interest;

C.   Attorneys' fees and costs; and

D.   Such other and further relief as this Court finds just and equitable.

### COUNT VIII
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS INTERESTS
### (BMG, ARC, Fuji)

134.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 133 as if fully set forth herein.

135.   Plaintiff had a reasonable expectation of entering into valid business relationships with numerous music licensees, and BMG, ARC, and Fuji knew of this reasonable expectancy.

136.   BGM, ARC, and Fuji nonetheless represented to third parties that they had rights to license Plaintiff's Copyrighted Songs when they had no rights in or to Plaintiff's Copyrighted Songs.

137.   Through these willfully false statements and representations, BMG, ARC, and Fuji have intentionally interfered with Plaintiff's business expectancy by convincing licensees to purchase licenses to Plaintiff's Copyrighted songs from BMG/ARC/Fuji instead of Plaintiff.

138.   With reasonably certainty, but for BMG's/ARC's/Fuji's false statements and representations, Plaintiff's business expectancy would have been realized.

33

139.    BMG's/ARC's/Fuji's interference was done purposefully, intentionally, and willfully, such that many licensees and potential licensees of Plaintiff's Copyrighted Songs were purloined and ultimately dissuaded from licensing Plaintiff's Copyrighted Songs from Plaintiff. As a result, BMG/ARC/Fuji intended to and did interfere with Plaintiff's business expectancy.

140.    Plaintiff has lost licensees, sales, and goodwill as a direct and proximate result of BMG's/ARC's/Fuji's tortious conduct.

WHEREFORE, Plaintiff prays that this Honorable Court enter an order and judgment in its favor and against BMG, ARC, and Fuji, including, but not limited to, the following relief:

A.    Permanent injunctive relief against BMG, ARC, and Fuji enjoining them, or any of their officers, agents, representatives, servants, employees, attorneys, successors, and assignees, and all others in active concert or participation with them, from falsely representing to third parties that they own the rights to Plaintiff's Copyrighted Songs and from tortiously interfering with Plaintiff's actual or prospective business relationships or expectancies;

B.    Damages to Plaintiff, in an amount to be determined at trial but in no event less than $100,000;

C.    Disgorgement of BMG's/ARC's/Fuji's ill-gotten profits;

D.    Both pre-judgment and post-judgment interest;

E.    Attorneys' fees and costs; and

F.    Such other and further relief as this Court finds just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues so triable.

Dated: October 18, 2016

Respectfully submitted,
TOLLIE CARTER

By: /s/ Daliah Saper

Daliah Saper
ARDC # 6283932
Saper Law Offices, LLC
505 N LaSalle, Suite 350
Chicago, IL 60654
Telephone: 312-527-4100
ds@saperlaw.com

Matthew Grothouse
ARDC # 6314834
Saper Law Offices, LLC
505 N LaSalle, Suite 350
Chicago, IL 60654
Telephone: 312-527-4100
matt@saperlaw.com

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TOLLIE CARTER,

              Plaintiff,

    v.

MARIA A. PALLANTE,
REGISTER OF COPYRIGHTS,
ARC/CONRAD MUSIC, LLC,
FUJI MUSIC GROUP, INC. and
BMG RIGHTS MANAGEMENT (US) LLC,
d/b/a/ BMG CHRYSALIS US

              Defendants.

Case No. 16-cv-06786

Honorable John Z. Lee

Honorable Mary M. Rowland

<u>Jury Trial Demanded</u>

## <u>AFFIDAVIT</u>

I, Tollie Carter, on oath, state:

1.     I have read the amended complaint in this matter.

2.     Regarding the allegations of which I have personal knowledge, I believe them to be true.

3.     Regarding the allegations of which I do not have personal knowledge, I believe them to be true based upon information that I have received from documents, and other people.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 18, 2016

_____
Tollie Carter

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 19, 2016 the foregoing

## PLAINTIFF'S VERIFIED FIRST AMENDED COMPLAINT

was filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filings to Defendants of record.

I certify that all parties in this case are represented by counsel who are CM/ECF participants.

By: /s/ Matthew R. Grothouse
Matthew R. Grothouse
ARDC # 6314834
Saper Law Offices, LLC
505 N LaSalle, Suite 350
Chicago, IL 60654
Telephone: 312-527-4100
matt@saperlaw.com

*Attorneys for Plaintiff.*